Filed 8/21/20  P. v. Aroz CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Amador)

----

| | |
|---|---|
| THE PEOPLE, | C084179 |
| Plaintiff and Respondent, | (Super. Ct. No. 15CR23620) |
| v. | |
| ALEX AROZ, | |
| Defendant and Appellant. | |

The 13-year-old daughter of defendant Alex Aroz's girlfriend told her mother that defendant had sexually assaulted her.  The matter was not reported to the authorities until the girl told her mother three days later that defendant had sexually assaulted her again.  Defendant retained counsel to represent him in the resulting criminal case, but could not pay counsel after the preliminary hearing, which led the appointment of a different counsel to represent him through the rest of the trial.

1

Following a jury trial, defendant was convicted of forcible lewd acts on a minor under the age of 14 (Pen. Code, § 288, subd. (b)(1)),[1] sexual penetration by a foreign object (§ 289, subd. (j)), sexual penetration of an unconscious person (§ 289, subd. (d)), and two counts of lewd acts on a minor under the age of 14 (§ 288, subd. (a)). He was sentenced to a 16-year state prison term.

On appeal, defendant contends the trial court abused its discretion and violated his right to the counsel of his choice by declining to appoint his retained counsel. He further contends the prosecutor was allowed to ask improper hypothetical questions to an expert witness on child sexual abuse accommodation syndrome (CSAAS), and prior uncharged sexual misconduct evidence was improperly admitted.

It was not an abuse of discretion or violation of defendant's right to counsel for the trial court to appoint a counsel for defendant in apparent accordance with its standard procedure for appointing counsel. While the prosecutor asked improper hypotheticals, the expert's answers and defense counsel's cross-examination of the expert rendered the error harmless. Finding the prior sexual misconduct evidence properly admitted, we shall affirm.

BACKGROUND

*The Incidents*

From February to March 2015,[2] 31-year-old defendant lived with his girlfriend K.R., her 13-year-old daughter T.L., and K.R.'s younger daughter. They resided in defendant's mobile home, with the two girls staying in rooms on either side of the bedroom defendant and K.R. shared. Defendant's friend Melanie Keathley lived with them from January to March 16.

---

[1]     Undesignated statutory references are to the Penal Code.

[2]     All further date references are to 2015 unless otherwise specified.

The door to defendant's bedroom was noisy when opened unless the handle was pushed and lifted. The home's thin walls allowed noise to be heard in other rooms. T.L.'s bedroom had no door, with the entry covered by a blanket or sheet.

On the evening of March 17, T.L. reported to Amador County Sheriff's Deputy Justin Coletti that defendant had sexually abused her. Between 1:00 a.m. to 2:00 a.m. on March 14, she awoke to a painful thrust in her vaginal area and discovered her shirt was pulled down, exposing her breasts. T.L. made eye contact with defendant, who removed one or more fingers from her vagina. After she woke up, defendant placed his mouth on her breasts. During this time, defendant left her immediate area, went to the doorway, and then returned to molest her two more times. Defendant put his hand down her pants and touched her crotch and grabbed her buttocks and vagina under her clothes before finally leaving. She then tried to text her boyfriend before going to the bathroom, where she discharged a little blood.

T.L. testified[3] that she told K.R. about the incident days after. K.R. reacted in a shocked manner, as if she did not know how to deal with it. She was angry with defendant and seemed sad. Nonetheless, she left T.L. and her sister in defendant's care.

T.L. told Deputy Coletti that on March 17, she and defendant were on the couch watching a movie when defendant started tickling her side just above the hip and below the rib cage. When T.L. tried to get up, defendant grabbed her arm, causing her to fall across his lap. She felt what seemed like his forearm rubbing against her vaginal area; as the rubbing got more precise, she determined defendant was using his fingers. T.L. told defendant to stop, and he eventually did. After she went to the bathroom and locked herself inside, defendant asked her, "you are not going to tell anyone, are you."

---

[3]    When T.L. refused to testify at trial after being offered use immunity, the trial court found her unavailable and the parties stipulated to the use of her preliminary hearing testimony, which was read to the jury.

K.R. testified that while she was at work, T.L. texted her that she was in the bathroom and scared.  T.L. had told her the previous day that something had happened.  An angry K.R. left work and raced home.

California Highway Patrol Officer Deborah Zaragoza pulled over K.R. for speeding as she was heading home.  K.R. showed a text message to Officer Zaragoza and said she needed to get home because she got a text from her daughter that "my boyfriend touched her inappropriately."  Officer Zaragoza did not read the text but requested for a sheriff's deputy to respond to the home and then followed K.R. home.

Officer Zaragoza knocked on the front door while K.R. went to the back of the home.  Defendant answered the front door and the officer asked him to come out to the front with her.  A quiet and subdued defendant complied.  Officer Zaragoza went into the house after deputies arrived, finding a quiet, not hysterical T.L. talking to a deputy with her mother nearby.  A frantic and angry K.R. told Officer Zaragoza she did not expect this to happen because she trusted defendant.

Deputy Coletti took T.L.'s statement at this time.  She was visibly upset, appeared to have been crying, and whimpered as she reported the incidents to the deputy.  That night, K.R. took T.L. to the hospital, where she was evaluated and told a nurse what happened.

K.R. and T.L. met Amador County Sheriff's Detective Ezra Peckinpaugh on March 18.  K.R. told the detective about T.L.'s text.  She was present when T.L. talked to the detective.  Detective Peckinpaugh and K.R. described T.L.'s demeanor at this time as upset, uncomfortable and nervous, and very shut down and introverted.

T.L. told the detective that late at night on March 13, or early in the morning on March 14, she awoke to a sharp pain and crammed feeling in her vagina.  Defendant was crouched next to her bed, and her shirt was pulled down, exposing her breasts.  Defendant withdrew his fingers after she moved.  Defendant walked to the doorway, but returned, pulling her shirt down, placing her right breast in his mouth, and grabbing her buttocks

4

through her clothes. He stood up, grabbed her breasts with his hand, and left the room. Defendant soon reentered T.L.'s room, where he grabbed her buttocks through the bedsheet and her clothing as he breathed heavily.

K.R. testified that after she and T.L. got home from a trip to Stockton on March 15, T.L. asked her how she felt about cheating and how she felt about rape. This seemed odd to K.R. but T.L.'s demeanor seemed normal when she asked the questions. T.L.'s behavior did not change from that Saturday the 14th to Monday the 16th. While K.R. likewise testified defendant's behavior was unchanged that weekend, she told Detective Peckinpaugh he acted weird and standoffish and was very inquisitive about whether T.L. had told her anything. She also told the detective defendant texted her on March 17 and asked if everything was all right, mentioned having a good conversation with T.L., and asked if she had talked to T.L.

Defendant came to K.R.'s work (a local restaurant) at 7:00 p.m. on March 13 and stayed until her shift ended at 1:30 a.m. She gave him a ride to his vehicle, and they drove their respective vehicles home, arriving at around 2:15 a.m. Her daughters and Keathley were home. K.R. and defendant went into their bedroom and closed the door. K.R. showered for about eight minutes; she did not hear their noisy bedroom door open while showering. Defendant was sitting on the bed when she showered and was in bed when she got out.

Sometime after 2:00 a.m., a neighbor knocked on the door and told Keathley that the lights inside defendant's truck were on. Keathley texted defendant about the neighbor's report. Defendant went outside to turn off the lights and returned to the bedroom after about five minutes, sleeping there with K.R.

A few days after the incidents, K.R. and her daughters moved in with Keathley, who had gotten her own place. They stayed with Keathley through June. Shortly after K.R. moved in, she told Keathley that defendant had molested T.L. K.R. maintained contact with defendant during this time, and texted him in March and April that she loved

5

him.  Defendant would also show up while K.R. and her children were staying with Keathley, which caused yelling and screaming arguments between K.R. and T.L.  T.L. did not want defendant there and would stay in her room when he came over.  Defendant took care of K.R. in Keathley's home in May after she returned home from the hospital following a car accident.  K.R. and her daughters moved into defendant's mother's house in June, staying with defendant and his mother until November.  K.R. was still in a relationship with defendant at the time of the trial; she loved defendant and did not want to see anything bad happen to him.

According to K.R. and T.L., shortly after March 17, a crying T.L. told K.R. that the incidents with defendant had not happened.  K.R. came up with the idea of writing a retraction letter.  Since T.L. was upset and crying, K.R. wrote the letter and T.L. signed it.  T.L. was crying at the time because she was upset over what she said about defendant.  T.L. and K.R. denied that K.R. pressured her into signing or writing the letter.

Keathley saw two letters addressed on the kitchen counter in March, sometime after K.R. and her daughters moved in, with one beginning, "[T]o whom it may concern."  K.R. and T.L. argued about the letter, with T.L. screaming and crying.  K.R. was set in stone regarding what she wanted the letter to say; what T.L. felt did not matter.

K.R. gave the retraction letter to Detective Peckinpaugh on March 19, explaining she wrote the letter and T.L. signed it.  Detective Peckinpaugh was concerned, so he arranged for T.L. to come in and speak with him, but K.R. never brought her in.

A child protective services social worker talked to T.L. about the letter.  T.L. said that what she told the deputies was true.  T.L. testified that she thought the social worker was talking about the retraction letter when she answered.  On May 20, shortly after the social worker's visit, Detective Peckinpaugh went to T.L.'s school to talk to her about the letter, but she refused to talk with him other than to say the letter had been sent.

T.L. testified that what she told Deputy Coletti about the incidents did not actually happen.  She was with defendant on March 17, because what she had claimed he did to

6

her previously had never happened. She fabricated the claims about defendant because she did not want him to be with K.R. Crying, she testified that she felt really bad about this.

Keathley had four prior convictions and was in jail for the most recent conviction on December 1. She saw defendant at jail at this time. He asked her a couple of times if she had talked to anyone and also told her not to talk to anyone.

*Prior Uncharged Misconduct*

When R.B. was 14 in 2003, defendant was her counselor at a teen center that provided counseling and support for crime victims. Defendant, who was 19, asked her to perform oral sex on him after meeting her at school and driving off with her in his car. She agreed and did so. They next went to his apartment where she consented to intercourse. Defendant later phoned a district attorney's investigator and admitted to having oral sex and consensual intercourse with R.B.

In 2003, defendant was also a counselor to 16-year-old A.T. at the same teen center. One day at the teen center, defendant kissed her and put his hands on her breast and vaginal area, under her clothes. A.T. told an investigator defendant kissed and grabbed her breast when they were playing a card game at the teen center. A.T. accompanied defendant downstairs, where he kissed her, pulled down her top, and sucked on her breast. Defendant put her hand on his erect, exposed penis. He then pulled down her pants and underwear and put his fingers in her vagina. A.T. told defendant she could not go through with this before he put his fingers in her. Defendant initially denied the incident to the investigator, but later said A.T. told him she could not go through with it after he put his fingers in her vagina.

K.G. knew defendant in high school when she was a freshman and he was a year or two ahead of her. K.G.'s sister was five or six years older than her and dating defendant's brother. In 2000, 14-year-old K.G. and her sister went with defendant and his brother first to a mall then to a residence late at night. They laid out blankets on the

7

floor; K.G.'s sister suggested she could sleep on the floor next to defendant but K.G. said she did not want to. K.G.'s sister went into a bedroom with defendant's brother. K.G. went to sleep and awoke to defendant on top of her, having intercourse with her. Even though K.G. told defendant to stop multiple times, the sexual assault lasted for a couple of minutes. K.G., who never had sexual intercourse before, went to the bathroom and cried. She had really bad vaginal bleeding after the assault. Forty-five minutes after the assault, she came out of the bathroom and curled up onto a recliner. She did not tell anyone that night, but in 2002 or 2003 she told her mother, who reported the matter.

*CSAAS Testimony*

Dr. Anthony Urquiza, a psychologist, testified as an expert on CSAAS. CSAAS was first formulated in an article written by Dr. Roland Summit in 1983. It is an educational tool for therapists treating sexually abused children to better understand what happens to the child and the myths and misperceptions related to child sexual abuse. It is not a predictive tool, as it is used only on children who have been abused.

Dr. Urquiza's testimony was intended to explain CSAAS in order to dispel common misperceptions about how sexually abused children react. He had not spoken to the victim and knew nothing about the case. CSAAS could not be used to determine whether a person was guilty or whether a particular child was molested, and he did not intend to do so.

Dr. Urquiza described the five parts of CSAAS: secrecy, helplessness, entrapment and accommodation, delayed and unconvincing disclosure, and recantation or retraction of the abuse allegation. With respect to secrecy, Dr. Urquiza explained some of the reasons why children often keep sexual abuse a secret. He said most children are sexually abused by someone they know who is bigger, stronger, more knowledgeable and may be in a position of authority over the child. Abusers may also use strategies such as threats, intimidation, special attention, gifts, or favors to keep their victim quiet.

The helplessness component addresses the misperception that children will be able to do something to keep themselves safe. Because of their inherent helplessness, most abused children submit and accept the fact there is nothing they can do to stop the abuse.

Entrapment explains that a child who cannot tell anyone or stop the abuse from continuing is trapped. With respect to accommodation, children may accommodate the abuse by disconnecting from the experience and suppressing feelings in order to cope with it. A child may thus discuss the abuse unemotionally due to disassociation and suppression of feelings. Just because a child does not break down and cry does not mean the child was not abused.

Delayed and unconvincing disclosure is tied to the secrecy component, because it is common for a child to delay reporting the abuse to maintain secrecy for awhile. Most children do not tell right away. There may be inconsistencies or vague descriptions in a child's first report, but more supportive responses may lead to a more detailed version as the child becomes more comfortable about reporting. Inconsistencies may increase with the incidents of abuse, as more incidents can make it more difficult for the child to be specific about a particular occasion.

Dr. Urquiza testified that 20 to 25 percent of children who have been abused disclose and then retract the allegation, usually because of pressure from the child's family.

Dr. Urquiza opined that hypothetical situations posed by the prosecutor were consistent with an unconvincing disclosure and a mother not giving support in regard to retraction. A hypothetical victim awakened while being sexually assaulted and then remaining silent was consistent with the helplessness component of CSAAS. A hypothetical victim's vague description of abuse was consistent with unconvincing disclosure. A child locking oneself in a bathroom after being abused multiple times could be an example of a victim's futile efforts to keep safe.

9

DISCUSSION

I

*Choice of Counsel*

A. *Facts*

Defendant was represented by a retained attorney, Matthew Ninke, through the preliminary hearing and a continuance for arraignment. Ninke then informed the trial court he had been contracted only through the arraignment. Ninke told the court defendant was indigent, that some other counsel had conflicts, another attorney may not have a conflict, and he would be willing to accept appointment if the court went "off the wheel." The trial court checked with two attorneys, both of whom had conflicts.

When the trial court asked whether attorney James Clark had a conflict, Clark replied that he did not know anything about the case and did not think so. Defendant replied that he would like to keep Ninke as his counsel, stating, "[I]f I give up Mr. Ninke as my attorney, I'm going to have to waive time. I'm not wanting to waive time. I want to get this done and over with a speedy trial." He added that there were too many details for a new attorney to pick up and reiterated that he did not want to waive time.

The court then held a discussion in chambers with the prosecutor, Ninke, and Clark, during which the court stated that it would appoint an attorney in accordance with its policy and procedures, and also discussed any potential conflicts of interest with Clark.[4] Clark had no conflict of interest in this case and the court appointed him as defendant's counsel.

---

[4] Defendant claims on appeal that the trial court refused to appoint Ninke because he was not on the conflict "wheel." Defendant's appellate counsel sent a proposed settled statement that the trial court rejected, as there was no discussion of the conflict wheel in chambers, and the discussion in chambers was only to ascertain whether Clark had any potential conflicts. We reject defendant's factual assertions to the extent they conflict with the settled statement.

10

B. *The Claim*

Defendant contends the trial court's appointment of Clark was an abuse of discretion as there was no valid reason for it to deny defendant his choice of counsel. He claims the decision violated his rights to due process, counsel of choice, and a fair trial.

A criminal defendant has a right to counsel in a criminal proceeding, either by a qualified attorney who is willing to represent the defendant for whatever the defendant is willing to pay, or through appointed counsel if the defendant cannot retain representation. (*People v. Noriega* (2010) 48 Cal.4th 517, 522.) The right to appointed counsel, however, does not contain a right to counsel of one's choice. (*Ibid.*; see *United States v. Gonzalez-Lopez* (2006) 548 U.S. 140, 151 [165 L.Ed.2d 409, 421].)

Section 987 establishes the appointment of counsel for indigent defendants. (*People v. Chavez* (1980) 26 Cal.3d 334, 344.) A court may appoint private counsel to represent a defendant if the county has no public defender or if the public defender is properly refused for good reason. (§ 987.2, subd. (a).)

Section 987.2 sets forth the following procedure for counties that use an assigned private counsel system:

"In counties that utilize an assigned private counsel system as either the primary method of public defense or as the method of appointing counsel in cases where the public defender is unavailable, the county, the courts, or the local county bar association working with the courts are encouraged to do all of the following:

"(1) Establish panels that shall be open to members of the State Bar of California.

"(2) Categorize attorneys for panel placement on the basis of experience.

"(3) Refer cases to panel members on a rotational basis within the level of experience of each panel, except that a judge may exclude an individual attorney from appointment to an individual case for good cause.

"(4) Seek to educate those panel members through an approved training program.

11

"(5) Establish a cost-efficient plan to ensure maximum recovery of costs pursuant to Section 987.8."  (§ 987.2, subd. (c).)

"The appointment of counsel for indigent defendants under section 987.2 rests within the sound discretion of the trial court.  [Citation.]  The court's discretion in the appointment of counsel may not be restricted by any fixed policy (e.g., a superior court policy to appoint its 'own' counsel in every case [citation]).  An abuse of discretion is not demonstrated, however, simply by the failure of a trial court to appoint a particular counsel whom the defendant has requested and who is willing to undertake the appointment.  [Citation.]"  (*People v. Horton* (1995) 11 Cal.4th 1068, 1098; *id*. at pp. 1099-1100 [no abuse of discretion despite bond of trust where record did not show counsel of choice was competent to handle case after preliminary examination stage].)

It appears the trial court followed its standard procedure under section 987.2, subdivision (c) in appointing Clark to represent defendant.  After determining defendant could no longer afford retained counsel, the court inquired whether other attorneys apparently available for appointment had a conflict, and appointed the first attorney who had no conflict and was available.  Ninke evidently was not considered because he was not on the panel mandated by section 987.2, subdivision (c).

While defendant wanted his previously retained counsel in order to obtain a speedier resolution of his case, there is no evidence he was prejudiced by the appointment.  Defendant claims the trial court should have been informed by subdivision (d) of section 987.2, which allows a trial court in a county of the first, second, or third class to, in the interest of justice, "depart from that portion of the procedure requiring appointment of the second public defender or a county-contracted attorney after making a finding of good cause and stating the reasons therefor on the record."  Defendant's reliance on this provision is unavailing because Amador County is not a county of the first, second, or third class.  (§ 987.2, subd. (j); Gov. Code, §§ 28020, 28022, 28023, 28024.)

12

We are likewise unconvinced by defendant's citation to the statement in *Alexander v. Superior Court* (1994) 22 Cal.App.4th 901 that the better practice is to continue the appointment of the attorney. Defendant quotes selectively from *Alexander,* which states in pertinent part, "*ordinarily* it is the better practice to continue *in superior court* the appointment of the attorney *assigned to an indigent defendant in municipal court*." (*Id.* at p. 914, italics added.) Defendant omits the italicized portions of the quote, which, read in the proper context, does not support his position. *Alexander* addressed the appointment of counsel where the defendant had already been appointed counsel in municipal court (*id.* at p. 904), unlike the case here, where defendant could no longer have retained counsel and now needed someone appointed for him. It does not support requiring a court to disregard its procedure to appoint a previously retained counsel.

Since defendant does not show the trial court failed to follow proper procedures for appointment of counsel, the court's decision to appoint a counsel that was available from the appointment panel rather than the previously retained attorney who was not, was within the trial court's sound discretion.

II

*Improper CSAAS Hypotheticals*

Defendant contends the trial court erred in overruling his objections to hypothetical questions the prosecutor asked of Dr. Urquiza. While we agree the trial court erred regarding two of the hypotheticals, we find the error harmless in light of Dr. Urquiza's answers, the court's instructions, and the prosecution's use of the improper hypotheticals.

A. *Facts*

On direct examination, the prosecutor gave the following hypothetical question to Dr. Urquiza: "Would you in your training and experience and research find that if a child reported sexual abuse to her mother, and not too specific terms at first, and then that mother didn't act and the abuse continued. And in this hypothetical, if the abuse

13

happened again, and she told mom again and it was finally reported to law enforcement. And in this hypothetical, the mother was the only one with access to the child. Admitted that she still loved the defendant, was in contact with him, or the suspect or perpetrator I should say. And then soon after, the mother writes a letter of recantation, and it appears as though the child has signed it, would these facts be consistent with a child who has the effects of the child sexual abuse accommodation syndrome?"

The defense objected, asserting this was an improper hypothetical. The trial court overruled the objection.

Dr. Urquiza answered:

"Well I don't know if this is in relation to the objection, but I want to clarify, it is not my place to make any determination as to whether any particular person is guilty of a crime or not or whether any particular child has been abused or not. That is just not my role.

"But clearly the scenario that you just provided is consistent with this notion of an unconvincing disclosure and this idea of retraction at least as it may be related to the presence of maternal support or ability to support a victim in their making and sustaining a disclosure."

The prosecutor then asked a hypothetical about whether a child's failure to yell out or scream during a sexual assault would be consistent with the helplessness component of CSAAS. The defense objected, and the trial court ordered the prosecutor to rephrase the question.

The prosecutor rephrased the hypothetical thusly: "I would like you to assume that there is a child who is awoken to being sexually assaulted or molested by a person who is bigger, stronger, and has more authority over that person.

"I would like you to also assume that when she awoke to that molestation, that she didn't scream out or call from help from her mother. Is that consistent with that helpless component that you described for the jury earlier?"

14

Dr. Urquiza answered:

"That pattern of events, the failure to cry out, the failure to protect themselves, the failure to do something that would be instrumental to keeping themselves sexually safe, is the reason why Dr. Summit specifically has that section on helplessness. Because he is trying to explain common characteristics of victims. And the fact that victims usually don't cry out. They don't usually do anything.

"Because in that situation, there is really nothing that they have available to them to be able to keep themselves safe. So that would, in that context, be a good system."

The prosecutor next asked: "I would like you to also assume some facts when it comes to a child who after being molested by that bigger, stronger person in authority, does disclose to a maternal support person. And I would also like you to assume that that person, mom—I am sorry—that that child vaguely describes inappropriate touching at first. Touching of the crotch and no further detail, is that consistent with that component that you described for the jury as the unconvincing aspect?"

Dr. Urquiza replied:

"Yes. What Dr. Summit—the simple answer is yes. But what Dr. Summit was trying to explain is just this notion that this disclosure, especially the initial disclosure, is just a difficult thing to do. And that is why it is better perceived not as an act, but as a process. And in the process, the statement is made by the victim. And then an assessment is made based upon the response of who they disclosed to.

"As I said earlier, if it is supportive, they can tell more. If it is not supportive, then it impairs the ability to talk more or inhibits their ability to talk more about what happened."

The prosecutor then asked: "I would also like you to assume some facts that this same child tells the parent, the mom, nothing happens. And that she is then in this hypothetical left alone with that suspect or perpetrator again. Is it consistent with the

15

entrapment or accommodation component that the child, let's say, locks themselves in the bathroom?"

Defense counsel asked for and received a continuing objection to the hypotheticals.

Dr. Urquiza asked for the question again. The prosecutor replied by asking Dr. Urquiza if he had testified regarding entrapment and accommodation that there is a feeling the child cannot stop the abuse from happening again. After Dr. Urquiza agreed, the prosecutor asked if they have to learn to deal with it. Dr. Urquiza replied, "To deal with the feelings that they have about their experience of abuse, correct."

The prosecutor then posed the following hypothetical: "Now would it be—I would like you to assume some facts. Would it be consistent with a child who after being sexually abused again or multiple times, that they try to do something to protect themselves like lock themselves in the bathroom?"

Dr. Urquiza answered:

"One of the things that Dr. Summit talks about is that there are futile efforts that victims may attempt to engage to keep themselves safe. And the key word here is futile.

"For example, I have kids who would put on two or three pairs of pajamas at nighttime because in their mind, putting on more pajamas makes it more difficult for them. But, of course, there is no control there and so they get abused. I have had kids who would pretend to be asleep. That seems kind of weird, if somebody is vaginally penetrating or something like that, molesting you, that you would be asleep.

"I don't think they are asleep. I think in a situation where there is nothing you can do about being revictimized, if you close your eyes, turn your head and be really still, that is your best way to cope with that situation.

"So if you're asking me if locking yourself in the bathroom could be an example of that, certainly. It is not going to keep them from being abused.

16

"At some point, you have to come out of the bathroom. You can't live the rest of your life in the bathroom. So you have to come out. And the same thing with running away. At some point, you end up going home. And that is where you might get abused if you're running away.

"It is a futile effort to try to deal with the situation when nothing is going to work."

On cross-examination, defense counsel elicited the following statement about recantation from Dr. Urquiza: "I think just the statement of a child recanting is different than making a determination as to whether somebody was abused or not." Asked if recantation is not determinative, Dr. Urquiza answered: "I think the best method that we have for making that determination as to whether somebody has been abused or not or whether somebody is guilty or innocent of a crime is the jury hearing the evidence." Dr. Urquiza also reiterated on cross-examination that CSAAS is not used "to make a determination whether a particular person was guilty or innocent of a crime" or "whether a particular child was abused or not."

Following cross-examination, defense counsel clarified that his objections to the hypotheticals were that the prosecutor was trying to use them to show defendant's guilt through CSAAS rather than properly using CSAAS to dispel about child abuse. Defense counsel told the court he believed his cross-examination took care of the problem, but he was required to make the objection in order to render effective assistance of counsel.

B. *Analysis*

The applicable law regarding CSAAS testimony was summarized in *People v. Sandoval* (2008) 164 Cal.App.4th 994: "CSAAS cases involve expert testimony regarding the responses of a child molestation victim. Expert testimony on the common reactions of a child molestation victim is not admissible to prove the sex crime charged actually occurred. However, CSAAS testimony 'is admissible to rehabilitate [the molestation victim's] credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony

17

claiming molestation. [Citations.]' [Citation.] ' "Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior. . . ." [Citation.]' [Citation.] 'For instance, where a child delays a significant period of time before reporting an incident or pattern of abuse, an expert could testify that such delayed reporting is not inconsistent with the secretive environment often created by an abuser who occupies a position of trust. Where an alleged victim recants his story in whole or in part, a psychologist could testify on the basis of past research that such behavior is not an uncommon response for an abused child who is seeking to remove himself or herself from the pressure created by police investigations and subsequent court proceedings. . . . [Citation.]' [Citation.]" (*Id.* at pp. 1001-1002, fn. omitted.)

It is improper for an expert to apply CSAAS to the facts of the case and conclude a particular child was molested. (*People v. Bowker* (1988) 203 Cal.App.3d 385, 393.) It is also improper for an expert to testify about CSAAS in a manner that directly coincides with the facts of the case. (*Id.* at p. 394; *People v. Gray* (1986) 187 Cal.App.3d 213, 218; *People v. Roscoe* (1985) 168 Cal.App.3d 1093, 1100 [expert testimony must be limited to a discussion of victims as a class; the expert must not discuss the witness in the case].) It is error to admit a CSAAS expert's response to hypothetical questions that closely track the facts of the case. (*People v. Jeff* (1988) 204 Cal.App.3d 309, 337-339.)

The first hypothetical asked of Dr. Urquiza was clearly improper. It closely tracked many of the specific facts of the case. Furthermore, by failing to tie the hypothetical to one of the five parts of CSAAS or some other aspect of CSAAS as described by Dr. Urquiza, the hypothetical risked the jury improperly using the answer as evidence of guilt. Dr. Urquiza's answer essentially neutralized this problem by asserting it was not his place to opine on guilt and then tied the facts of the hypothetical to the CSAAS notions of unconvincing disclosure and retraction.

18

The second question, while it contained some facts of the case, relied on less specific facts than the first, and, more importantly, tied the question directly to one aspect of CSAAS, namely how a child's failure to cry out after being awakened by a sexual assault is consistent with the helplessness component of CSAAS. Dr. Urquiza's answer again steered the discourse away from improperly using CSAAS as a predictive tool.

The third question, where the prosecutor asks if a child assaulted by a bigger stronger person in authority and then gives a vague description of the assault is acting consistently with the unconvincing aspect of CSAAS, is likewise proper. While the facts somewhat trace some of the facts of the case, they are still general, and the question is directly tied to an aspect of CSAAS and is used to explain a potentially unconvincing part of T.L.'s testimony. This is a proper use of CSAAS.

The fourth question is more like the first, as takes particular facts from the case, the victim locking herself in the bathroom after being sexually abused multiple times, and weakly tries to tie that to CSAAS of the helplessness component of CSAAS. Dr. Urquiza responds by talking more generally about the helplessness component of CSAAS and then gives examples involving facts different from those in defendant's case.

Improper use of CSAAS testimony as evidence of guilt is subject to the *People v. Watson* (1956) 46 Cal.2d 818 standard of harmless error. (*People v. Bowker, supra*, 203 Cal.App.3d at p. 395.) While the first and fourth hypotheticals were improper, the combination of Dr. Urquiza's answers to them and his subsequent responses to the defense's questions on cross-examination render the error harmless. Dr. Urquiza made it clear on direct and cross-examination that his testimony could not be used as evidence that defendant committed the charged offenses or T.L. was in fact molested, and that the best determinant of guilt was the jury hearing the evidence. His answers to the improper questions also diverged from the specific facts of the case to more general issues related to CSAAS. Concluding it is not reasonably probable that a different result would ensue if

19

the objections to the improper questions had been sustained, we find the error here harmless.

III

*Uncharged Sexual Misconduct*

Defendant contends it was an unconstitutional abuse of discretion to admit the uncharged sexual misconduct evidence over his objection. We disagree.

"By reason of [Evidence Code] section 1108, trial courts may no longer deem 'propensity' evidence unduly prejudicial per se, but must engage in a careful weighing process under [Evidence Code] section 352. Rather than admit or exclude every sex offense a defendant commits, trial judges must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense. [Citations.]" (*People v. Falsetta* (1999) 21 Cal.4th 903, 916-917.)

We review a trial court's ruling under Evidence Code section 1108 for abuse of discretion. (*People v. Loy* (2011) 52 Cal.4th 46, 61.)

The incident involving R.B. was remote, taking place in 2003, 12 years before the charged offenses. Like the present charged crimes, this uncharged offense involved a victim, the 14-year-old R.B., of a similar age to the 13-year-old T.L. Although R.B. assented to the sex acts, the incident was nonetheless admissible to show the sexual interest defendant has to girls of a similar age to T.L. It also showed defendant's willingness to exploit a position of trust or power, the boyfriend of T.L.'s mother or R.B.'s counselor, to satisfy his sexual desires.

20

The incident involving A.T. was remote like the incident with R.B. It involved a 16-year-old victim, and defendant put his fingers in her vagina after she told him not to. This uncharged offense is relevant by showing defendant's willingness to exploit a position of trust and power to satisfy his sexual attraction to underage girls, even when the girl does not consent.

While defendant was apparently underage when he committed the incident against 14-year-old K.G., this incident shows defendant's willingness to commit a sexual assault against his younger victim. The assault against K.G. was also initiated when K.G. was sleeping, like the March 14 incident against T.L. Like the March 14 assault on T.L., defendant penetrated K.G.'s vagina in this sexual assault, albeit with his penis rather than the digital penetration he committed against T.L.

The uncharged incidents were not more egregious than the charged offenses, which involved a sexual assault and digital penetration by defendant against the 13-year-old daughter of his girlfriend. While each uncharged incident had some dissimilarities with the charged offenses, an exact match is not necessary to render uncharged sexual misconduct admissible. (See *People v. Soto* (1998) 64 Cal.App.4th 966, 984 [Evid. Code, § 1108 does not require exacting similarity between charged and uncharged offenses].) The uncharged offenses are sufficiently similar to the charged crimes to render them relevant. The 12 to 15 years between the charged and uncharged offenses likewise does not defeat their admissibility in light of their similarity to the charged crimes. (See, e.g., *People v. McCurdy* (2014) 59 Cal.4th 1063, 1099 [approximately 30 years not too remote]; *People v. Robertson* (2012) 208 Cal.App.4th 965, 992-994 [thirty years before the charged crime not too remote]; *People v. Branch* (2001) 91 Cal.App.4th 274, 284-285 [same]; *Soto*, at pp. 969-970, 977-978, 991 [uncharged acts 30 and 22 years earlier not too remote].) The uncharged acts did not involve excessive time to admit, taking the brief testimony of four witnesses. They also would not confuse or distract the jurors, as the facts of the uncharged misconduct did not involve disputed facts. Given

21

their relevance and lack of prejudice in relation to the charged crimes, their admission was not an abuse of discretion.

Since the evidence was properly admitted under Evidence Code sections 1108 and 352, defendant's constitutional claim fails as well.  (*People v. Harris* (2005) 37 Cal.4th 310, 336 ["the application of ordinary rules of evidence does not implicate the federal Constitution"].)

DISPOSITION

The judgment is affirmed.


_____/s/_____<br>
BLEASE, Acting P. J.

We concur:


_____/s/_____<br>
ROBIE, J.


_____/s/_____<br>
RENNER, J.

22